Dara KENNEY, Appellant (Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 91–103.

Supreme Court of Wyoming.

July 20, 1992.

Leonard D. Munker, State Public Defender and Lee E. Christian, Asst. Public Defender, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., and D. Michael Pauling, Asst. Atty. Gen., for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT,* and GOLDEN, JJ.

URBIGKIT, Justice.

Appellant, Dara Kenney (Kenney), was convicted of possession with intent to deliver marijuana, conspiracy to deliver marijuana, and delivery of marijuana. We decide this case on the primary issue of whether dual representation of co-conspirators creates a conflict of interest by denying Kenney her constitutional right to effective assistance of counsel. To follow our recent decision in *Shongutsie v. State*, 827 P.2d 361 (Wyo.1992), we reverse and remand.[1]

---

* Chief Justice at time of oral argument.

1. The subject of joint or dual representation of criminal defendants was previously unaddressed in the Wyoming Rules of Criminal Procedure. *See* W.R.Cr.P. 6 (superseded March 24, 1992). This court's decision in *Shongutsie* and the current F.R.Cr.P. 44(c) is recognized and more closely delineated in W.R.Cr.P. 44(c), effective March 24, 1992, which now provides:

> Joint representation.—Whenever two or more defendants have been charged with offenses arising from the same or related transactions and are represented by the same retained or assigned counsel or by retained or assigned

## I. ISSUES

The following issues are presented on appeal, but we find the first issue dispositive:

1. Did Kenney's attorney's representation of both Kenney and her co-conspirator create a conflict of interest which denied Kenney her Sixth Amendment right to effective assistance of counsel?

2. Did the trial court err in failing to inquire whether Kenney knowingly and voluntarily waived any constitutional right to conflict-free representation?

3. Did the introduction of Kenney's prior bad acts by her own counsel deny her effective assistance of counsel?

4. Was Kenney's confession voluntary?

5. Were the prosecutor's characterizations of Kenney improper or prejudicial?

6. Did Kenney receive a trial by a lawful and proper jury? [2]

7. Did the State prove that the substance seized was marijuana?

## II. FACTS

This is the story of a woman, not without prior troubles, who developed an association with a man who was involved in dealing in controlled substances. It is also the story of their joint representation by one attorney, developed during the criminal proceedings under what must be termed unusual circumstances. Finally, it is a record of her innocent plea, guilty verdict, and penitentiary sentence while her boyfriend, well served by the same attorney, entered into a plea bargain to achieve a more preferable non-penitentiary sentence. In this case, we are provided a clear example of dangers to constitutional rights which can result from joint representation.

On May 17, 1990, the Cheyenne, Wyoming Police Department received a tele-phone call from an informant stating that she had met a person, Maria Linares (Linares), who said she had access to marijuana. The police set up an undercover narcotics operation and followed Linares to Kenney's home. After her visit to Kenney's home, Linares delivered a package of marijuana to the informant which had apparently been obtained from Kenney. Following the transaction, Kenney telephoned Detective Mark Hollenbach of the Laramie County, Wyoming Sheriff's Department to inquire if she was under investigation, since she had previously worked for Hollenbach as an informant and had spotted the police officer driving by her home on May 17. Kenney testified that the detective responded that she was not under investigation.

A second undercover operation was conducted on July 19, 1990 with police agents going to Linares' apartment to purchase additional marijuana. Police then followed the suspect to a local convenience store from where she placed a telephone call. Kenney arrived shortly thereafter and, after picking up Linares, drove to Linares' apartment where Linares then delivered marijuana to a second informant.

Kenney again telephoned Detective Hollenbach on July 19 to inquire if she was under investigation. Kenney had seen another law enforcement officer as she drove to Linares' apartment during the July 19 drug transaction. The response she received, according to her testimony, was still negative.

On July 23, 1990, Detective Hollenbach went to Kenney's home and requested she voluntarily accompany him to the police station. Kenney complied and Hollenbach drove her to the station. Conflicting testimony arises as to whether she was advised of her *Miranda* rights upon arrival at the station. (Hollenbach testified: "I advised

counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall order separate representation.

2. This interesting issue will remain undecided in this decision. By mistake, a juror peremptorily challenged by Kenney remained on the jury and participated in its verdict and the resulting criminal conviction.

her of her rights * * *." Kenney testified: "No, he never read me my rights.") At the police station, Kenney confessed to selling marijuana to Linares. Detective Hollenbach and Kenney subsequently left the police station to retrieve the marijuana she admitted was being stored at her parent's home. During the police interview, she stated that John Connette (Connette), her roommate and co-actor in these events, had originally received the marijuana from Alfred Solis (Solis). Detective Hollenbach and Kenney then drove to her home where Connette retrieved additional marijuana and gave it to Detective Hollenbach. Detective Hollenbach and Kenney returned to the police station and Connette arrived shortly thereafter. Following their arrival at the police station, Kenney and Connette signed *Miranda* waivers and confessions.

Later that evening, Connette participated in an undercover operation which apprehended Solis. Following the arrest of Solis, Connette and Kenney were permitted to return to their home. The following morning, Kenney and Connette went back to the police station for further questioning. The police told them they could proceed with their planned vacation and to call when they returned to Cheyenne. Following their vacation, Kenney and Connette returned to the police station on August 9, 1990, to then be arrested and charged for their controlled substance offenses. Kenney was charged with one count of possession with intent to deliver marijuana, one count of conspiracy to deliver marijuana, and one count of delivery of marijuana and then released on bail. Connette was charged with one count of possession with intent to deliver marijuana and one count of conspiracy to deliver marijuana.

A preliminary hearing was held on August 23, 1990 with Kenney being represented by Donald E. Miller (Miller), a private attorney who Kenney had retained.[3] The preliminary hearing was a joint hearing with Connette, who was represented by his retained counsel, Mary Kloeckner (Kloeckner). After a brief hearing during which neither defendant testified, probable cause was found and both were bound over to the district court.

The significant procedural events in this case were confined in time. Arraignment was held Friday, September 14, 1990, with Kenney entering a not guilty plea. The case was set for a jury trial on November 13. On September 24, Kenney, through retained counsel Miller, filed a motion to suppress evidence, testimony and statements and a motion for discovery and disclosure of exculpatory matters. The case was re-set and subpoenas changed for a trial date of November 19. On November 14, a comprehensive pretrial *Denno* suppression hearing was held with testimony from four witnesses, including Kenney and three police officers. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). At the close of argument the next day, the trial court announced its decision that the motion to suppress would be denied. The bases stated were: that the confession had been voluntary and the evidence was admissible when Kenney was not in custody at the time of her confession; that she had been advised of her rights; and that her confession was not the product of threat or coercion.

The day after suppression was denied, with trial only three days away, strange things began to happen. November 16 became a busy day for pleadings.[4] A very

3. Kenney stated in a November 1990 affidavit, obviously prepared by her trial time attorney, that prior to her preliminary hearing, she requested the appointment of a public defender on the basis that she was indigent. She further included in the document the contention that the county court judge in Laramie County had denied her request, saying she was able-bodied and could find a job in order to pay her attorney's fees. There is absolutely no confirmation of this bald statement in the information available regarding the preliminary hearing and the

county court docket entries. The validity of the statement is clearly questionable.

4. Filed sequentially in the trial court record were the following instruments:

Kenney filed pleadings designated "Emergency Motion for Enlargement of Time to Obtain Replacement Counsel of Her Own Choice"; "Emergency Motion for Court to Grant Leave to Don Miller to Withdraw as Attorney of Record"; and "Emergency Motion for Leave of Court to Proceed in Propria Personam Until Replace-

scholarly and lawyerly sounding letter addressed to Miller and signed by Kenney requested his withdrawal as her attorney. After the order was entered setting the trial for November 19, Miller, as counsel, filed an Emergency Motion for Enlargement of Time, stating that he had been instructed to withdraw as attorney and that Kenney desired to secure different counsel. At the same time, he filed a motion to withdraw and attached the original November 16 representation termination letter.

A very legalistic document entitled "Emergency Motion for Enlargement of Time to Obtain Replacement Counsel of Her Own Choice" was filed pro se under the signed name of Kenney, with a certification of service likewise signed by her. A second motion, comprehensively legalistic in text, entitled "Emergency Motion for Court to Grant Leave to Don Miller to Withdraw as Attorney of Record," was similarly filed pro se by Kenney along with her certification of service. The third motion similarly filed pro se was titled "Emergency Motion for Leave of Court to Proceed in Propria Personam Until Replacement Counsel of Her Own Choice Can Be Obtained."

A fourth document was filed entitled "Emergency Motion for Hearing on the Emergency Motion to Quash Subpoena" along with an accompanying "Emergency Motion to Quash Subpoena," each filed in the name of the co-conspirator, Connette, and signed by Kloeckner as counsel, with certification of service by Kloeckner.[5] On November 16, a fifteen minute hearing was held where the trial court permitted Miller to withdraw as counsel, and reset the trial for December 3.[6]

---

ment Counsel of Her Own Choice Can Be Obtained."

Retained counsel, Miller, obtained a court order setting the jury trial for November 19.

Attorney Kloeckner, representing Connette, filed an "Emergency Motion for Hearing on the Emergency Motion to Quash Subpoena" and an "Emergency Motion to Quash Subpoena."

Attorney Miller filed, as requested by his soon-to-be ex-client, an "Emergency Motion for Enlargement of Time" to secure an extension of time beyond the trial date of November 19. Miller then filed a "Motion for Withdrawal of Counsel" to which he attached the original of a letter he apparently received, dated November 16, from Kenney. The relevant portion of these motions will be discussed, as necessary, in the remainder of this opinion.

5. The form, style and text of the acknowledgements of service for these five November 16 pleadings, three signed pro se by Kenney and two signed by Kloeckner in behalf of the co-conspirator, Connette, are essentially identical (with the only real difference being the misspelling of Kenney's name). One sample suffices to illustrate:

CERTIFICATE OF SERVICE

I, Dara Kinney, hereby certify that a true and correct copy of the above and foregoing Emergency Motion For Court To Grant Leave To Don Miller To Withdraw As Attorney Of Record was properly served upon all appropriate parties herein by placing a copy thereof in the United States mail with first class postage prepaid and addressed as follows:
Mr. Jon Forwood
Deputy District Attorney

413 Laramie County Courthouse
Cheyenne, Wyoming 82001
on this 16 day of November, 1990.
signed /s/
Dara Kinney

6. The full text of the hearing is as follows:

THE COURT: This hearing is pertaining to two filings, 20–228 and 20–229, State of Wyoming versus Dara Kinney [sic].

Mr. Miller, I understand that you have a motion you'd like me to consider; is that correct?

MR. MILLER: Actually, Judge, my motion follows—I didn't realize this when I filed the motion, but Mr. Forwood can make or clarify for the Court—I've got a motion for withdrawal of counsel, and there have been some other motions filed, prior to my motion, by the defendant. I just found that out. I'm not sure how we want to proceed.

My motion to withdraw is based on a letter from Miss Kenney, informing me that she no longer wants me to represent her in this matter. And after having read the letter, I'm not really anxious to represent her in the matter any further.

I'm not sure, Judge, I've never been in this position, where we go from here. But her complaint[s] [are] numerous and—

THE COURT: Is your client in court today?

MR. MILLER: Yes, she is, your Honor.

THE COURT: Would you like to step forward, Miss Kenney. Raise your right hand and be sworn.

DARA KENNEY
a Defendant herein, called for examination on behalf of the Court, having been previously duly sworn, testified on her oath as follows:

EXAMINATION
BY THE COURT:

Q. What's the problem?

A. Well, for one thing, Mr. Miller informed me that if we lost my suppression hearing, that we wou[ld]n't have a chance during the trial.

Q. Well, I don't want to get into that. I think I'm invading the attorney/client privilege if I do. I'm not going to hear anything about communications with your lawyer. I do need to know, however, what are your plans with respect to retaining new counsel.

A. I'd like to look around and see if I could find a counsel.

Q. Have you been in contact with anybody?

A. No, I haven't.

Q. Has anybody contacted you about this matter?

A. No, they have not.

Q. Who drafted this letter, may I ask? Did you draft it?

A. Myself and a friend of mine that's a legal student.

Q. Who is your friend?

A. Her name is Erin. She really doesn't want her name given out.

Q. Well, this idea of due process cuts both ways. The State's entitled to have its case heard too. I'm not going to delay this thing indefinitely.

A. I don't want it delayed indefinitely, your Honor. I just would like to seek a different counsel.

THE COURT: Does anybody wish to examine? I really am reluctant—

MR. FORWOOD: If I may?

THE COURT:—to breach this attorney/client privilege. I don't [want] you to ask questions of the witness in that regard.

MR. FORWOOD: I would propose that the Court inquire of Miss Kenney, in further detail, as to who drafted the three motions that were filed with the Court; one under the heading of Emergency Motion for the Court to Grant Leave for Don Miller to Withdraw as Attorney of Record; the other emergency motion for Enlargement of Time to Obtain Replacement Counsel of Her Own Choice; the third motion being an 'Emergency Motion Asking Permission for Leave of the Court to Proceed in—

THE COURT: Why don't you go ahead and inquire, Mr. Forwood?

MR. FORWOOD: Okay.

EXAMINATION
BY MR. FORWOOD:

Q. Miss Kenney, who drafted those three motions?

A. Myself and a friend of mine.

Q. Who is this friend?

A. Her name is Erin.

Q. Erin what?

A. Your Honor, she requested that I do not state her full name.

THE COURT: Why?

THE WITNESS: Because she is just a student at this time, and I'm not sure if she had anyone else help her with it, but it's not from a legal counsel.

THE COURT: Okay. That sounds as if we probably ought to explore this; what is her name?

THE WITNESS: Erin Hasein.

THE COURT: Pardon?

THE WITNESS: Erin Hasein.

THE COURT: Where does she live?

THE WITNESS: Right now she resides in Fort Collins.

THE COURT: When did you last see her?

THE WITNESS: I saw her last evening.

THE COURT: Does she have a phone number down ther[e]?

THE WITNESS: Umm, yes, but I'm not—I don't have it with me.

THE COURT: Go ahead, Mr. Forwood.

Q. (BY MR. FORWOOD) Has there been any contact between you and your co-defendant's attorney of record, Miss Klecker [sic]?

A. No, there has not.

Q. Direct or indirect, or Ms. Hasein?

A. No.

Q. Do you feel there has been any interference with your relationship with Mr. Miller by Miss Clecker [sic]?

A. I do not think so.

Q. Who is—I guess, was it your independent idea or someone else's that you file this [sic] motions?

A. More or less, my idea.

Q. More or less? I'm trying to see if you've been receiving counsel from someone else?

A. No, I h[a]ve not, sir.

Q. No other attorney has inter—

A. No, I have not.

Q. —fered with the attorney/client relationship?

A. No.

Q. The State just wants to make sure that we're not going to later be bombarded by some other claim of interference.

A. No, sir.

Q. You say Ms. Husain [sic] is a law student at which law school?

A. I'm not sure.

Q. How do you know that she's a law student?

A. I know she's going to school. She has been in school for four years.

Q. Who typed these; do you know?

A. She did it on her computer.

Q. She lives in Fort Collins?

A. Uh-huh.

Q. Do you have an address or phone number where I could contact her?

A. No, I don't.

Q. How did you contact her?

A. She contacted me actually, because I had tried to contact her about three weeks ago to ask her for money to retain a counsel. Your Honor, I did not choose Mr. Miller as my counsel. A friend of mine paid him to represent me.

THE COURT: Well, he is—I thought he did a very good job in the motions and I find it

Kenney was a high school dropout who had been enrolled in the alternative education program of the local school system and then, following final discontinuance, received her GED. It was apparent beyond any reasoned question that a very experienced typist with access to a computer style printing system had finalized the "pro se" documents (except sometimes misspelling the litigant's name) and that the author of the instruments was both trained and experienced in the law.

Samples of the documentation are illustrative. Kenney's "Emergency Motion for Enlargement of Time to Obtain Replacement Counsel of Her Own Choice" stated in part:

1. Don Miller told Dara Kenney that he does not know how to defend her, has refused to file the additional pretrial motions requested by Dara Kenney that he file, and tried to get her to plead guilty.

\* \* \* \* \* \*

5. That Dara Kenney's constitutional right to retained counsel of her choice will be denied her if she is forced through trial represented by an attorney she has already discharged, in violation of Article 1, Section 6 and Section 10, of the Consti[tut]ion of the State of Wyoming and the Fourth and Fifth Amendment to the Constitution of the United States.

6. That the State will not be prejudiced by the minimal time required to obtain replacement counsel after the Court grants leave to Don Miller to withdraw as attorney of record.

Kenney's "Emergency Motion for Court to Grant Leave to Don Miller to Withdraw as Attorney of Record" stated in part:

disturbing that someone would judge their lawyer, depending upon the outcome of the motions. The quality of the work and what the Court ruled are really independent of one another. But unfortunately, that seems to be a school of thought, that the result of a case is the only indication of the quality of a lawyer. That certainly is fallacious.

I have to simply vacate the trial date, grant your motion to withdraw, Mr. Miller, and I'll give you a new trial date. We'll go to trial in

1. Defendant Dara Kinney [sic] was arrested August 9, 1990, on charges by two seperate [sic] criminal complaints, involving two counts in complaint 90–08–0016, and one count in complaint 90–07–0015. One count charged conspiracy with John Connette to commit the crime of delivery of marijuana. One count charged possession with intent to deliver marijuana. The other complaint charges a single count of delivery of marijuana.

2. Defendants Dara Kinney [sic] and John Connette appeared before Judge Allen and asked for court-appointed counsel due to their indigency. Judge Allen told Defendant Dara Kinney [sic] that he would not appoint counsel because she looked like she was able to work, and told Defendant Dara Kinney [sic] that she must inform the Court by 8/13 who her attorney would be or she would go to jail.

3. Defendant Dara Kinney [sic] had no money to retain counsel and could find no attorney to represent her without prepayment of fees and cost and giving security therefor.

\* \* \* \* \* \*

9. That Dara Kinney's [sic] constitutional right to retained counsel of her choice will be denied her if she is forced through trial represented by an attorney she has already discharged, in violation of Article 1, Section 6 and Section 10, of the Const[itut]ion of the State of Wyoming and the Fourth and Fifth Amendment to the Constitution of the United States.

In her letter to Miller requesting his withdrawal, Kenney stated in part:

two weeks from today. I mean, two weeks from this Monday. Will the State be ready?

MR. FORWOOD: The State will be ready at any time the Court says.

THE COURT: Who will you get to retain as counsel?

THE WITNESS: Umm, I'm not sure. I'm supposed to speak with my mother this afternoon. She's—the people she works for in Fort Collins, she's talking to them today about maybe either trying to get some money or them hiring me a lawyer.

6. Where are the motions to require the State to disclose exculpatory evidence; to disclose the list of witnesses; to preserve the evidence, and release it to us for independent testing; to provide copies of all of their tests results; to disclose their methods and equipment used for the testing; to disclose whether they are going to try to introduce evidence or witnesses so that they could be investigated, otherwise how can you expect to impeach them unless you ask for any impeaching evidence. Without asking specifically for all the things we needed before trial they are forever lost to me, and you open us up for an ambush by the prosecutor.

\* \* \* \* \* \*

8. I have the right to discharge you from employment, and ask you to immediately withdraw from my case as the attorney of record:

The Code of Professional Responsibility in relevant portions states as follows: DR 2-110(B) "Mandatory Withdraw[a]l. .... a lawyer representing a client in other matters shall withdraw from employment, if:

(4) He is discharged by his client."

DR 2-110 "Withdraw[a]l from employment.

(A) In general.

(2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.

(3) A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned."

9. You are also aware that I am entitled to my entire file immediately, so that I will not be prejudiced in obtaining replacement counsel.

Therefore, you are to immediately file the above instructed motions in my behalf, and to return to me all of the records, files, documents, exhibits, and all other papers, in my cases, including the transcripts, and copies of all correspondence and notes taken during telephone calls, relating in any way to me, my case, or others you have been in contact with pertaining thereto, in compliance with the mandatory requirements of the Code of Professional Responsibility.

Do not underestimate the seriousness of these instructions. These motions must be filed immediately, not after trial starts, they must be filed this morning. Your failure to comply as instructed will prejudice me in what is left of my criminal trial, and I must try to salvage what little is left of my right to a defense.

Kenney's "Emergency Motion for Leave of Court to Proceed in Propria Personam Until Replacement Counsel of Her Own Choice Can Be Obtained" stated in part:

4. That Dara Kenney cannot arrange for replacement counsel until after this Court grants leave of Court for Don Miller to withdraw as attorney of record.

5. That Dara Kenney's constitutional right to retained counsel of her choice will be denied her if she is forced through trial represented by an attorney she has already discharged, in violation of Article 1, Section 6 and Section 10, of the Consti[tut]ion of the State of Wyoming and the Fourth and Fifth Amendment to the Constitution of the United States.

\* \* \* \* \* \*

WHEREFORE, the Defendant, Dara Kenney, prays that this Court grant the instant emergency motion for leave to proceed in propria personam until competent replacement counsel of her own choice can be obtained after Don Miller is granted leave of Court to withdraw as attorney of record, and granting this motion is in the interest of justice.[7]

---

7. If it were not for the different sized type that was used by the printing equipment which produced the pro se documents and the difference of names given for the persons involved in the

Four days after the withdrawal hearing, on November 20, Kloeckner entered an appearance on behalf of Kenney. A hearing was held after the appearance had been made, which basically related itself to questions of additional discovery. There was, however, during the course of that discussion, the following comment by counsel:

MS. KLOECKNER: I would like to address the issue that you raised about—the question you raised about if she decided to fire me at the eleventh hour. I believe she would have the right to do so, Your Honor. Under the Sixth Amendment she has the right to counsel, and I believe it includes a counsel of her choice. However, I would like to state for the record, I don't believe she would have anybody else who would represent her.

It is my understanding from this client, she's talked to over 25 attorneys, she has no money, she's basically indigent. I agreed to accept her case for various reasons.

THE COURT: I'm not worried about that.

MS. KLOECKNER: I'll tell you, if I was fired, the last straw would be a public defender, and that answers your query.

During the discovery hearing session, the subject of the prior completed suppression hearing developed and the following occurred regarding that session:

MS. KLOECKNER: Well, yes, I can, but could I address what you said before first?

THE COURT: Yes. You represented the co-defendant, and you had every right to do that.

MS. KLOECKNER: That is exactly part of what I was going to say.

THE COURT: You had a right and obligation to be there.

MS. KLOECKNER: Yes, sir. My client's name was thrown around.

THE COURT: And you're [sic] client is?

MS. KLOECKNER: Mr. Connette is my client.

THE COURT: And you attended that hearing; is that right? I want the record to show that you were there, and without any responsibilities, and you had no connection to the Kenney matter.

On November 27, a further discovery hearing was held before the trial court

---

requested action by the trial court filed by Connette's attorney, one would detect more than some similarities other than the specific subject of the certificate of service form which was noted earlier. For example, in one of the pro se motions, the last substantive paragraph stated in part that, "the State will not be prejudiced by the minimal time required to obtain * * *." In the Connette document, we are informed, "the State of Wyoming will not be prejudiced by the Court granting * * *." Furthermore, the form of Kenney's prayers were: "WHEREFORE, the Defendant, Dara Kenney, prays that this Court grant the instant emergency motion * * *." The author of the Connette motion provided: "WHEREFORE, the Defendant, John Connette, prays that this Court grant the instant Emergency Motion * * *." The only difference among the variant documents in regard to this paragraph of the prayer is that in one document, the words "emergency motion" were capitalized and in all of the other documents, those particular words were in lower case. It is noteworthy among all of these instruments that there is almost no misspelling or typographical mistake, except for the spelling of Kenney's name. Punctuation is expert and the phraseology is learned and professional.

Kenney's name is misspelled (Kinney) in her letter to her attorney, correctly spelled on the signature line and then similarly misspelled in the caption and text of the Connette "Emergency Motion to Quash Subpoena" (Kinney); the Connette "Emergency Motion for Hearing on the Emergency Motion to Quash Subpoena" in text and caption; the caption and text of the pro se "Emergency Motion for Court to Grant Leave to Don Miller to Withdraw as Attorney of Record" (eighteen times); correctly spelled on the pro se "Emergency Motion for Enlargement of Time to Obtain Replacement Counsel of Her Own Choice" filed the same day (twelve times); as well as correctly spelled on the pro se "Emergency Motion for Leave of Court to Proceed in Propria Personam Until Replacement Counsel of Her Own Choice Can Be Obtained." Kenney's name was generally misspelled in court documents filed by the district attorney, but in the entry of appearance by Kloeckner, the caption was correctly spelled and then misspelled in the text, although correctly spelled in the attached affidavit in caption and text. It was thereafter generally spelled correctly by successor counsel in subsequent filings, but not always.

which, in variant ways, was described as a due process or a taint hearing.[8] Another discovery hearing was held December 6 and the case finally proceeded to trial December 10. At that time, the co-conspirator dual charges against the co-actor, Connette, remained pending and similarly continued until a plea bargain was made and the sentence of guilty to one count of possession with intent to deliver marijuana and one count of delivery of marijuana was entered on August 16, 1991.

Kenney was tried separately from her co-conspirator and her two-and-one-half day trial began on December 10, 1990, resulting in conviction of possession with intent to deliver marijuana, delivery of marijuana, and conspiracy to deliver marijuana. On March 15, 1991 Kenney was sentenced to eighteen to thirty-six months on all counts to be served in the Wyoming Women's Correctional Facility, with the sentences to be served concurrently. Co-conspirator Connette, after having accepted a plea bargain arrangement, received a suspended sentence and probation. Kenney appeals from her judgment and sentence.

## III. DISCUSSION

The primary issue of this appeal is whether Kenney was denied her Sixth Amendment right to effective assistance of counsel because of her attorney's dual representation of her and her co-conspirator. While Kenney was tried separately, she contends that her attorney's dual representation created a conflict which adversely affected her.

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right is applied to the states through the Fourteenth Amendment. Additionally, the Wyoming Constitution provides the right to counsel in art. 1, § 10. This right to counsel not only includes that the assistance of counsel be effective, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but also that representation be conflict-free. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). *Cf. Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (considering the converse issue: right of the accused to be represented by the same attorney as a matter of requested substitution of counsel).

■ While the United States Supreme Court reviews claims of ineffective assistance of counsel due to conflicts of interest under the standard of review adopted in *Cuyler*, 446 U.S. 335, 100 S.Ct. 1708, Wyoming recently adopted a more stringent approach. Absent a valid waiver, prejudice

---

**8.** One of the more unusual exchanges occurred during the session where counsel for Kenney was addressing the question of a taint hearing, which was described as "evidence that was essentially obtained in violation of the inherent right of a defendant as a citizen of the state and the United States of America." In response to the trial court's announcement that a suppression hearing would be held, Kenney's counsel stated:

> THE COURT: I expect to have an evidentiary hearing Thursday. I will set aside all afternoon, and I suspect you to have whatever witnesses you intend to call to prove this theory, and I will listen to all of your testimony.
>
> So, why don't you subpoena the officers and put them on the stand and find out what they do know for your due process claim that they somehow overreached.

I don't know what else to tell you. I'm not going to order the state to answer these questions that you raised, to affirm or deny, whatever that means. That is not covered by the rules of criminal procedure.

> MS. KLOECKNER: Am I understanding the court to say that the government is not required to state whether or not they broke laws in connection with the investigation and prosecution of this case?
>
> THE COURT: Did you break any law, Jon?
>
> MR. FORWOOD: No, Your Honor.
>
> THE COURT: That's your answer. I knew that was going to be their answer. So what do you want me to do now?
>
> MS. KLOECKNER: Nothing, Your Honor. I'm just doing my job.
>
> THE COURT: They said they didn't break any laws. Now what are you going to do?
>
> MS. KLOECKNER: Present what evidence I can get up to Thursday.

is presumed in all instances of multiple representation of criminal defendants. *Shongutsie,* 827 P.2d at 367. The Wyoming Supreme Court has further ruled that "in the absence of an appropriate waiver, multiple representation will constitute reversible error." *Id.* (A presumption of prejudice in a claim of ineffective assistance of counsel consequently mandates reversal. *Lozada v. Deeds,* —— U.S. ——, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991); *Strickland,* 466 U.S. 668, 104 S.Ct. 2052; *Abels v. Kaiser,* 913 F.2d 821 (10th Cir. 1990); *Estes v. United States,* 883 F.2d 645 (8th Cir.1989)). "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing." *Holloway,* 435 U.S. at 489–90, 98 S.Ct. at 1181–82. This presumption of prejudice demands that the trial court separately advise each defendant of the right to be represented by an attorney free from any conflict of interest and of the dangers inherent in multiple representation. *Shongutsie,* 827 P.2d at 367; W.R.Cr.P. 44(c) (effective March 24, 1992).

It is apparent that the new W.R.Cr.P. 44(c) is somewhat stricter than is the comparable F.R.Cr.P. 44(c). This difference found in the text of the last sentence is apparent. W.R.Cr.P. 44(c) provides: "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall order separate representation." F.R.Cr.P. 44(c) states: "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." *See Wheat,* 486 U.S. 153, 108 S.Ct. 1692. Overtly, this court has adopted a bright line position. In part, this serves to protect the defendant; in reality, it protects the prosecutor from a subsequent claim of an invalid guilty verdict.

Treating multiple representation problems with reference only to the interests of the client ignores totally the substantial public interests that are at stake. The problems that arise in the context of multiple representation impinge so substantially upon these public interests that the consent of the client should often, if not always, be insufficient to justify multiple representation.

* * * Clearly, the administration of justice may be adversely affected by multiple representation. Considering the notoriously overcrowded condition of criminal trial dockets throughout the country and the frequency with which multiple representation cases form the basis of appeals and habeas corpus petitions, the administration of criminal justice is largely disserved when an attorney represents multiple defendants regardless of whether actual conflict or prejudice exists.

John Stewart Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney,* 62 Minn. L.Rev. 119, 155–56 (1978) (footnotes omitted). *See* Allan L. Schwartz, Annotation, *Circumstances Giving Rise to Conflict of Interest Between or Among Criminal Codefendants Precluding Representation by Same Counsel,* 34 A.L.R.3d 470 (1970).

 If the defendant insists on retaining an attorney who is representing another co-defendant, the trial judge must obtain a "knowing and voluntary waiver of the right to be represented by an attorney free from any conflict of interest" (and, under the new rule, determine that no real conflict exists). *Shongutsie,* 827 P.2d at 367. While *Shongutsie* involved defendants who were tried together, this case involves co-conspirators who were tried separately. In either case, the trial judge has a duty to apprise the defendant of conflict problems that may develop during any dual representation of interested parties. The required advice was not provided to Kenney for her to understand the danger in joint representation and, consequently, to waive thoughtfully, with full understanding of the risk. Conversely, of course, under these circumstances, the attorney should not have un-

dertaken the joint representation. Wyoming Rules of Professional Conduct for Attorneys at Law, Rule 1.7 (1986). Under the factual circumstances existent between Connette and Kenney, one person likely was the "heavy" as the principal and the other constituted the "follower." At least, that would be the realistic defense. Joint representation was sure to disfavor one or the other. In reality, it turned out to be Kenney against whom primary responsibility was finally assessed. This concern was directly addressed in *Wheat*, 486 U.S. 153, 108 S.Ct. 1692 and *Armstrong v. People*, 701 P.2d 17, 21 (Colo.1985). *See Glasser*, 315 U.S. 60, 62 S.Ct. 457; *State v. Olsen*, 258 N.W.2d 898 (Minn.1977); and Geer, *supra*, 62 Minn.L.Rev. 119. An interesting analysis and definitive result for civil litigation is found in *Bagdan v. Beck*, 140 F.R.D. 650 (D.N.J.1991).

The defendant's right to effective assistance of counsel is best guaranteed by a vigorous adversarial system; a system which is cut short when an attorney has conflicting interests in representing multiple clients. The presumption of prejudice discourages attorneys from compromising their most fundamental duty of loyalty to their client. *Shongutsie*, 827 P.2d at 367; *Strickland*, 466 U.S. 668, 104 S.Ct. 2052; Wyoming Rules of Professional Conduct for Attorneys at Law, Rule 1.7.[9] When an attorney represents co-conspirators, any theories of defense should avoid harm to either client and yet represent the best interests of both. Unfortunately, this may not be possible.

This is described in one law journal as "an ever-lurking possibility of a conflict of interests." Arthur John Anderson, Jr.,

Note, *Conflict of Interests in Criminal Proceedings*, 23 Ark.L.Rev. 250, 250 (1969).

It must be kept in mind that a conflict of interests is essentially a problem of effective assistance of counsel; it is a cause of the real disease aimed at being prevented—i.e., inadequate representation. Lessened effectiveness of counsel is the ultimate result and clearest indication of a harmful conflict of interests. *Id.*

Each defendant's strategy is subject to compromise for the benefit of the other client. That is what occurred here. Kenney's trial counsel was not at liberty to inculpate or cast any blame on Kenney's co-defendant, as he was also the attorney's client. Kenney's attorney avoided making any comparison or contrast between Kenney and her co-defendant at both the trial and the sentencing.

Connette was not called as a witness by either prosecution or defense counsel during the Kenney trial. The defense consisted of the testimony of Kenney's sister, who admitted she was on probation from three separate felony convictions for the delivery of cocaine, and Kenney's testimony which principally attacked the conduct of the chief investigating officer for the State. The obvious theory of defense of the primary responsibility of Connette as the source of the "merchandise" was totally absent. The introduction into the trial process of prior bad acts of Kenney and the failure in any way to direct responsibility toward the then untried co-conspirator and jointly represented Connette, clearly justifies the conclusion of Kenney's appellate counsel that not only an operative status of conflict of interest existed, but that the conduct demonstrates prejudicial results.

---

**9.** Wyoming has adopted the ABA Model Rules of Professional Conduct. Rule 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Counsel for Kenney stated in appellate brief:

> Appellant stated on direct examination that she had no intent to sell the marijuana found in her parent's shed. * * * Appellant was never asked questions by her attorney regarding Connette's rights to ownership of, or plans with, that marijuana.
>
> A conflict of interest existed at the initial choice of defense strategies. The trial strategy precluded Attorney Kloeckner from defending Appellant by shifting responsibility to Connette by thorough cross-examination of the witnesses. If anything, counsel *inflated* Appellant's role, and deflated co-defendant's role at trial through introduction of prior bad acts of her own client.[10]

(Emphasis in original.)

Presumed prejudice in cases of multi-client representation promotes judicial economy by insuring a defendant's right to effective assistance of counsel by defining the procedures for multi-client representation. *Shongutsie*, 827 P.2d at 368; *Olsen*, 258 N.W.2d 898. Not only must the trial judge explain the consequences of multi-client representation, but the trial court must be satisfied that no real conflict of interest exists. The requirement of a knowing waiver and lack of any reasonable basis for conflict lessens the likelihood of appeals based on claims of ineffective assistance of counsel and establishes a clear standard of review. W.R.Cr.P. 44(c) (effective March 24, 1992). *See People v. Easley*, 46 Cal.3d 712, 250 Cal.Rptr. 855, 759 P.2d 490 (1988) and *Com. v. Davis*, 376 Mass. 777, 384 N.E.2d 181 (1978). *See also Moreau v. State*, 588 P.2d 275 (Alaska 1978).[11]

Since *Shongutsie*, 827 P.2d 361 is dispositive and mandates reversal, we need not address the other issues raised on appeal. Dara Kenney was not represented by an attorney who was fully free from conflicts of interest between jointly represented clients. She was neither informed of this right by the trial court nor did she knowingly waive her right to conflict-free representation after being fully advised at some

---

**10.** Anomalies clearly exist in this most disturbing record which do not end with the trial events. Initially, Kloeckner stated she was contacted and assumed representation on November 20, 1990. However, materials in a supplementation of the record requested by the Attorney General on March 28, 1991 reveal that at a session involving the continuing prosecution of Connette, this appellant, as well as Kloeckner and Connette, were present when the trial court engaged in extensive examination as to whether either Connette or Kenney would object to the conflict obviously resulting from the prior conviction of Kenney and the forthcoming trial of Connette. At that session, counsel stated:

> MISS KLOECKNER: When Dara Kenney and John Connette first contacted me in regards to defending them against the charges back in August of 1990, one of the first things that we discussed—and both of the defendants were present at that time—was the conflict of interest. It came up again in November when Miss Kenney decided to change counsel, and contacted me to see if I would be willing to take her case, essentially pro bono. And it came up again within the last weeks in preparation for the suppression hearing. The decision was made whether or not to call Miss Kenney as a witness in that hearing. She decided—we decided not to call her. But on three separate occasions at least, and also throughout the total representation since August of Mr. Connette, and since Miss Kenney's representation since November.

> This has been an issue that I have gone out of my way to explain to both of the defendants, and make them aware that there is a conflict of interest, and I have explained it to the best of my ability at any and all times so that they understood.

There is another document that bears on the subject. An affidavit of Kenney dated September 30, 1991 was originally submitted by appellate counsel for Kenney for inclusion in the record and was initially rejected by order of this court; but now upon reconsideration, it will be considered for the purpose of quoting one sentence from the affidavit: "John Connette paid for my representation by Ms. Mary Kloeckner. Connette is my roommate and was the co-defendant in my case."

**11.** The status achieved for Wyoming law, first by Justice Thomas' academic and definitive analysis in *Shongutsie*, now followed for this appeal, and then comprehensively and finitely defined in the newly adopted W.R.Cr.P. 44(c), was academically advanced and justified in comprehensive legal analysis by Gary T. Lowenthal, *Joint Representation in Criminal Cases: A Critical Appraisal*, 64 Va.L.Rev. 939 (1978) and Mary Elizabeth Heim, Note, *Conflicts of Interest in the Representation of Multiple Criminal Defendants: Clarifying Cuyler v. Sullivan*, 70 Geo. L.J. 1527 (1982).

time before the trial was undertaken.[12] *Easley*, 759 P.2d at 500.

Reversed and remanded for retrial.

---

**12.** This was not a pleasant case to review nor does Kenney present an enthusiastic challenge to whom relief in constitutional concepts should be afforded. Unhappily, we cannot find that she was provided a constitutionally proper trial in order to justify affirming the conviction.

