2003 WY 18

**David ASCH, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 00–128.

Supreme Court of Wyoming.

Feb. 6, 2003.

John M. Burman, Laramie, Diane E. Courselle, Director, Defender Aid Program; Kimberly A. Corey and Gay George, Student Interns, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; Jillian M. Bullock and Zachary T. Lee, Student Interns, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1]   A jury convicted David Asch (Asch) of possession of a felony amount of methamphetamine, in violation of Wyo. Stat. Ann. § 35–7–1031 (LexisNexis 2001).  In this appeal, Asch contends that he received ineffective assistance of counsel, that the district court improperly instructed the jury after a witness refused to answer a question, and that he was denied his right to due process of law when he was forced to appear before the jury in shackles.

[¶ 2]   We reverse.

## ISSUES

[¶ 3]   Six issues have been identified by the parties:

1.   Was Asch's right to effective assistance of counsel violated as a result of a conflict of interest in his representation at the preliminary hearing?

2.   Was Asch's right to effective assistance of counsel violated as a result of counsel's failure to obtain a copy of the preliminary hearing transcript and to undertake a reasonable investigation of the case?

3.   Was Asch's right to effective assistance of counsel violated as a result of counsel's failure to ensure that Asch would be in street clothes during the trial?

4.   Was Asch's right to effective assistance of counsel violated as a result of counsel's calling a witness who refused to answer a question and was held in contempt of court?

5.   Did the district court abuse its discretion in instructing the jury that it could consider the witness's refusal to answer a question as bearing on her credibility?

6.   Was Asch denied his right to due process of law as a result of his legs being shackled during the jury trial?

## FACTS AND PROCEDURAL HISTORY

[¶ 4]   At about 10:30 p.m., on September 2, 1999, in Casper, Asch was the front-seat passenger in a car being driven by Sheryl Sutton (Sutton).  Casper Police Officer Andrew Swisher (Swisher) stopped the car for expired registration.  In the process, Swisher observed Asch "making . . . concealing movements" to the center and left of his seat. The denouement of the traffic stop was Sutton's arrest for possession of a marijuana pipe found under the passenger seat, and Asch's arrest for possession of seven grams of methamphetamine found between the front seats and for interference with a peace officer for having lied about his identity.

[¶ 5]   At his initial appearance in county court (now referred to as circuit court) the following day, Asch requested appointment of counsel.  An order was entered on September 9, 1999, appointing the State Public Defender to represent him.  A preliminary

* Chief Justice at time of oral argument.

hearing was set for September 13, 1999. The Notice and Order of Preliminary Hearing shows copies having been sent to "prosecutor" and "defense counsel," but neither is identified by name.

[¶ 6] The preliminary hearing took place at the time and date scheduled. However, Nadine McLeod (McLeod), the contract public defender assigned to represent Asch, did not appear. Instead, Asch was represented by Wilhelm Bierman (Bierman), the supervising attorney in the Casper office of the State Public Defender. Asch was bound over for trial in the district court.

[¶ 7] McLeod appeared with Asch at arraignment in the district court on November 9, 1999. Asch pled not guilty to the felony possession charge, but he pled guilty to the misdemeanor charge of interference with a peace officer. Sentencing on the misdemeanor charge was postponed pending completion of a presentence investigation report. The felony count was placed in the "trial stack;" it eventually was tried to a jury on February 22, 2000.

[¶ 8] The State called only two witnesses at trial—the arresting officer and an expert from the Wyoming State Crime Laboratory. Sutton was the only defense witness. Succinctly stated, Officer Swisher described the traffic stop and arrests, the expert identified the substance as methamphetamine, and Sutton testified that the methamphetamine belonged to her and not to Asch. On cross-examination, Sutton refused to identify the source of the methamphetamine, even in the face of the district court judge's direct order to do so. Proceedings were then had outside the presence of the jury, Sutton was found to be in direct contempt of court, and was sentenced to sixty days in jail. The jury was then brought back into the courtroom and the district court judge orally instructed them as follows:

> Ladies and Gentlemen of the Jury, as you saw and heard, Ms. Sutton refused to answer the pending question that had been asked by the District Attorney's Office in this matter. I'm going to advise you that you can consider her refusal to answer that question in connection with your consideration of all other evidence and matters that

may bear on her credibility and the credibility of her testimony before the Court.

[¶ 9] After the jury convicted Asch of the felony possession charge, the district court ordered the preparation of an addendum to the previously ordered pre-sentence investigation report. On March 28, 2000, Asch was sentenced to incarceration in the Wyoming State Penitentiary for a term of sixty to seventy-two months. Asch filed his Notice of Appeal with the district court on April 24, 2000.

[¶ 10] Development of the issues in this appeal has followed a tortuous path, at best. The appeal was docketed on May 18, 2000. Subsequently, five orders were entered extending the time for filing of briefs. The proceedings were also stayed while this Court considered Asch's motion for a limited remand for an evidentiary hearing on the issue of ineffective assistance of counsel. Well after oral argument, we granted Asch's earlier-filed motion for remand, not only to develop the evidence as to ineffective assistance of counsel, but also as to the shackling issue, which had not been raised in the initial appellate briefs. On remand, the district court held an evidentiary hearing and issued a decision letter finding, first, that Asch had failed to establish ineffective assistance of counsel, and second, that Asch had failed to prove that he was prejudiced by having been shackled during the trial. The case was then returned to this Court, where we allowed supplemental briefing. The briefs were filed in June and July of 2002. Further oral argument was not allowed, but the case was "reconferenced" on August 13, 2002.

## DISCUSSION

### *Was Asch's right to effective assistance of counsel violated as a result of a conflict of interest in his representation at the preliminary hearing?*

[¶ 11] Claims of ineffective assistance of counsel are reviewed under the following standard:

> "Wyoming has a well-established and oft-repeated standard for reviewing claims of ineffective assistance of counsel:

'When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo. 1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo.1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of [the] case." *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.' *Chapman v. State*, 2001 WY 25, ¶ 6, 18 P.3d 1164, 1168–69 (Wyo.2001) (*quoting Grainey v. State*, 997 P.2d 1035, 1038–39 (Wyo.2000))."

*Becker v. State*, 2002 WY 126, ¶ 12, 53 P.3d 94, 98–99 (Wyo.2002) (*quoting Reyna v. State*, 2001 WY 105, ¶ 19, 33 P.3d 1129, 1134–35 (Wyo.2001)). An appellant bears the burden of proving that counsel was ineffective. *Barkell v. State*, 2002 WY 153, ¶ 10, 55 P.3d 1239, 1242 (Wyo.2002).

[¶ 12] The State does not contest Asch's assertion that the preliminary hearing is a critical stage in the criminal proceedings at which a defendant has a constitutional right to the assistance of counsel. *See Davila v. State*, 831 P.2d 204, 214 (Wyo.1992) (Urbigkit, C.J., dissenting); *Auclair v. State*, 660 P.2d 1156, 1160 (Wyo.), *cert. denied*, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 249 (1983); and *Hurst v. State*, 563 P.2d 232, 235 (Wyo. 1977). In turn, Asch does not base his argument on the "failure" of his assigned counsel to appear at the preliminary hearing.[1] Instead, Asch premises his argument that he received ineffective assistance of counsel at the preliminary hearing on the theory that Bierman's representation of him created a conflict of interest because Thomas Smith (Smith), who represented Asch's "co-defendant" Sutton, was also an assistant public defender within Bierman's office.

[¶ 13] It is, perhaps, obvious that an attorney with a direct, personal conflict of interest might not provide effective representation to a defendant. An attorney who is related to a crime victim, for instance, should not be called upon to represent the alleged perpetrator of that crime. That type or level of conflict, where the attorney's personal in-

1. In fairness to McLeod, her non-appearance at the preliminary hearing probably should not be characterized as a "failure." Although Asch's initial appearance in the circuit court was on Friday, September 3rd, the Order Appointing Counsel was not signed until Wednesday, September 8th, and filed Thursday, September 9th. The Notice and Order of Preliminary Hearing was not signed and filed until Friday, September 10th. Inasmuch as the preliminary hearing took place at 9:00 a.m., on Monday, September 13th, it is entirely plausible that, as McLeod testified at the remand hearing, she was not notified of the preliminary hearing before it took place. Neither Bierman nor McLeod could recall specifically why Bierman appeared and McLeod did not. McLeod speculated that Bierman may have been at the courthouse for other matters and simply filled in for her.

terests conflict with those of his client, is readily recognized. Almost as apparent is the conflict of interest created when one attorney, though free of personal conflict, attempts to represent two people charged with the same crime. In that situation, the interests that conflict are the interests of the two defendants.

> "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, ... [joint representation] may well ... preclude[ ] defense counsel ... from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable. Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing ... the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another. Examples can be readily multiplied.
>
> ...
>
> [I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to **refrain** from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process."

*Shongutsie v. State,* 827 P.2d 361, 365 (Wyo. 1992) (*quoting Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978)) (emphasis in original).

[¶ 14] Because the potential for a conflict of interest " 'inheres in almost every instance of multiple representation,' " this Court has rejected a case-by-case inquiry, and has adopted "the rule that prejudice will be presumed in all instances of multiple representation of criminal defendants and, in the absence of an appropriate waiver, multiple representation will constitute reversible error." *Shongutsie,* 827 P.2d at 367 (*quoting*

*Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). This rule applies whether the co-defendants are tried jointly or separately. *Kenney v. State,* 837 P.2d 664, 673 (Wyo.1992).

[¶ 15] W.R.Cr.P. 44(c) governs the process for obtaining a waiver of the potential conflict of interest in a case of joint representation:

> Whenever two or more defendants have been charged with offenses arising from the same or related transactions and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall order separate representation.

While such a waiver may allow a defendant to be represented by the attorney of his choice, despite the potential conflict of interest, it does not rid the attorney of his obligation to abide by the rules of professional conduct. *Kenney,* 837 P.2d at 673–74; *Shongutsie,* 827 P.2d at 367.[2]

[¶ 16] W.R.Cr.P. 44(c) was adopted in response to *Shongutsie. Kenney,* 837 P.2d at 664 n. 1, 675 n. 11. It contains two provisions specifically applicable to the instant case. First, conflict of interest must be addressed not only where co-defendants are charged with the same offense, but where they are charged with "offenses arising from the same or related transactions...." Consequently, the fact that Asch was charged with a methamphetamine offense, while Sutton was charged with a marijuana offense, does not negate the necessity for a conflict of interest inquiry. And second, conflict of interest must be addressed not only where co-defendants are represented by the same attorney, but also where they are represented

---

**2.** Rule 1.7 of the Wyoming Rules of Professional Conduct for Attorneys at Law prescribes the lawyer's duties, independent of anything the court might do, when clients' interests may be adverse to one another.

by "retained or assigned counsel who are associated in the practice of law...." The question is the effect, if any, of the fact that Bierman, who represented Asch at the preliminary hearing, and Smith, who represented Sutton, both worked in the Casper office of the State Public Defender.

[¶ 17]   Asch contends that the appearance of both Bierman and Smith in these related cases requires reversal of his conviction because (1) based on *Shongutsie*, a presumption of prejudice exists; (2) the State Public Defender's Office is a "firm" within the meaning of the rules of professional conduct;[3] and (3) the State Public Defender's Office is not exempt from the requirement that attorneys must provide effective assistance of counsel, free from any conflict of interest.[4]

[¶ 18]   The State counters Asch's argument first by noting that the facts of this case are clearly distinguishable from the facts in both *Shongutsie* and *Kenney*. In *Shongutsie*, one lawyer represented two defendants in a joint trial. In *Kenney*, one lawyer represented two defendants in separate trials. Here, separate attorneys in the Casper office of the State Public Defender briefly represented two co-defendants in separate proceedings.[5]   The question of first impression for this Court is whether we should adopt a *per se* rule presuming a conflict of interest and disqualifying by imputation attorneys within the State Public Defender's Office from separately representing defendants charged with offenses arising from the same incident.

[¶ 19]   The State contends that Wyoming should follow the lead of other states that have found public defenders' offices different from private law firms, and have concluded that a case-by-case inquiry into conflicts of interest is appropriate.   *See, for example, People v. Daniels,* 52 Cal.3d 815, 277 Cal. Rptr. 122, 802 P.2d 906, 915, *cert. denied,* 502 U.S. 846, 112 S.Ct. 145, 116 L.Ed.2d 111 (1991) (automatic disqualification would hamper ability of public defender to represent indigents in criminal cases); *State v. Pitt,* 77 Hawai'i 374, 884 P.2d 1150, 1156 (1994) (case-by-case inquiry because public defender's office, as a government office, is different from a law firm); *People v. Miller,* 79 Ill.2d 454, 38 Ill.Dec. 775, 404 N.E.2d 199, 202 (1980) (no *per se* rule is necessary; a case-by-case analysis is sufficient to determine whether any facts peculiar to the case preclude multiple representation within a public defender's office); and *State v. Bell,* 90 N.J. 163, 447 A.2d 525, 528 (1982) (same potential for prejudice does not exist in public defender's office).

[¶ 20]   In his Reply Brief, Asch points out numerous cases that have reached the opposite conclusion.   *See, for example, Ward v. State,* 753 So.2d 705, 708 (Fla.App.2000) (public defender's office is equivalent of a law firm for conflict purposes); *Perkins v. State,* 226 Ga.App. 613, 487 S.E.2d 365, 368 (1997) (for purposes of claims of ineffective assistance of counsel, lawyers in the same public defender's office are considered members of a law firm); *State v. Watson,* 620 N.W.2d 233, 241 (Iowa 2000) (representation of two clients by different attorneys from a public defender's office constitutes dual representation for purposes of conflict of interest analysis); and *Jackson v. State,* 329 S.C. 345, 495 S.E.2d 768, 773 (1998) (multiple representation out of a public defender's office may be a conflict of interest).

---

**3.**   Rule 1.10(a) of the Wyoming Rules of Professional Conduct for Attorneys at Law provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one (1) of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2."   And since the State Public Defender's Office is an organization that employs lawyers, it is a "firm" under the rules. *See,* John Burman, *Conflicts of Interest in Wyoming,* XXXV Land & Water L.Rev. 79, 123 (2000).

**4.**   " 'This Court is disinterested in establishing a rule which minimizes caution in co-representation cases or, even with recognition of the limited resources of the public defender, which would not emphasize the importance of different counsel where any conflict in representation could be envisioned.' "   *Shongutsie,* 827 P.2d at 367 *(quoting Reynoldson v. State,* 737 P.2d 1331, 1336 (Wyo.1987)).

**5.**   Smith represented Sutton throughout her proceedings, but Bierman only represented Asch at his preliminary hearing.   McLeod, a contract attorney, did not physically operate out of the public defender's office.   Asch has not raised a conflict of interest issue as to McLeod.

[¶ 21] We are quite cognizant of the fact that, in *Reynoldson*, and again in *Shongutsie*, we emphasized the need to maintain caution in multiple representation cases, despite the limited resources of the State Public Defender's Office, " 'where any conflict in representation could be envisioned.' " *Shongutsie*, 827 P.2d at 367 (*quoting Reynoldson v. State*, 737 P.2d 1331, 1336 (Wyo.1987)). We continue to adhere to that principle. Nevertheless, because representation of separate defendants by separate attorneys is fundamentally different than representation of separate defendants by a single attorney, we agree with the courts of those jurisdictions that have found a case-by-case inquiry, rather than *per se* disqualification, appropriate for cases alleging a conflict of interest based on representation of co-defendants by separate attorneys from the State Public Defender's Office. We do not consider this to conflict with the holdings of *Shongutsie* and *Kenney*.

[¶ 22] There are several reasons we reject automatic disqualification of assistant public defenders under these circumstances. The first reason is aptly stated in Comment d(iv) to Section 203(2) of *The Restatement (Third) of Law Governing Lawyers:*

> [P]ublic defenders who are subject to a common supervisory structure within an organization ordinarily should be treated as independent for purposes of [imputing conflicts of interest]. The lawyers provide legal services, not to the public defender office, but to individual defendants. Ordinarily, the office would have no reason to give one defendant more vigorous representation than other defendants whose interests are in conflict. Thus, while individual defendants should be represented by separate members of the defender's office, the representation of each defendant should not be imputed to other lawyers in an office where effective measures prevent communications of confidential client information between lawyers employed on behalf of individual defendants.

[¶ 23] Similarly, there is no financial incentive for attorneys in a public defender's office to favor one client over another. *People v. Christian,* 41 Cal.App.4th 986, 48 Cal. Rptr.2d 867, 874 (1996). The public defender does not receive more money if one client prevails and another does not. *See,* David H. Taylor, *Conflicts of Interest and the Indigent Client: Barring the Door to the Last Lawyer in Town,* 37 Ariz. L.Rev. 577, 606 (1995). An assistant public defender, as a salaried government employee, simply does not have the financial interest in a case that is inherent in private practice. *Turbin v. Superior Court In and For County of Navajo,* 165 Ariz. 195, 797 P.2d 734, 737 (1990); *Bell,* 447 A.2d at 528.

[¶ 24] Another reason to adopt a case-by-case inquiry for conflicts of interest within the State Public Defender's Office is that to do otherwise would needlessly jeopardize the right of individual defendants to skilled and competent representation. As noted by the Illinois Supreme Court, "[i]n many instances the application of such a *per se* rule would require the appointment of counsel with virtually no experience in the trial of criminal matters, thus raising, with justification, the question of competency of counsel." *People v. Robinson,* 79 Ill.2d 147, 37 Ill.Dec. 267, 402 N.E.2d 157, 162 (1979). *See also Bell,* 447 A.2d at 528.

[¶ 25] We do not wish to overstate this argument, inasmuch as all Wyoming attorneys are expected to have some level of knowledge of criminal law. But it goes without saying that an experienced public defender who specializes in criminal defense is a valuable asset within the criminal justice system, especially to the indigent defendant. Furthermore, given Wyoming's many small communities, with a limited number of lawyers, it could be difficult in many cases even to find local counsel for a defendant.

[¶ 26] The third reason to avoid an automatic disqualification rule for imputed conflicts of interest among assistant public defenders is fiscal. Paying outside counsel every time there are multiple defendants in a case would, no doubt, be quite an expense for the taxpayers of the state. Where there has been no showing of an actual conflict of interest, and thus no showing of prejudice to the defendants, the minimal benefit of a *per se* rule would not justify the additional expense. While we cannot

and should not "put a price on" the legal representation we provide to indigent defendants, the judicial branch of government still has an obligation to be fiscally responsible.

[¶ 27] Finally, a *per se* disqualification rule is not necessary because W.R.Cr.P. 44(c) already provides an effective mechanism for dealing with potential conflicts of interest in cases of multiple representation.[6] Whether or not assistant public defenders that work out of the same office are, or are not, comparable to members of a private law firm, they are certainly "associated in the practice of law" and there is no reason W.R.Cr.P. 44(c) should not apply to them.

[¶ 28] In a perfect world, W.R.Cr.P. 44(c) would always be applied just as it is written. The assistant public defenders assigned to represent co-defendants would notify the judge of such assignment. The judge would then immediately hold a hearing, where inquiry would be made into any possible conflicts of interest, and where the defendants' rights and options would be explained to them. Absent a waiver by the defendants or a finding by the judge that there was good cause to believe no conflict of interest was likely to arise, separate counsel would be appointed. And, of course, a perfect record would be made of all the proceedings.

[¶ 29] Unfortunately, the instant case took place in the real world, and perfect procedures were not followed. To the credit of the State Public Defender's Office, a contract attorney, McLeod, was assigned to represent Asch, presumably because Smith had been appointed to represent Sutton.[7] But the preliminary hearing was set and held before McLeod was even aware of the appointment. That resulted in Bierman's appearance in her stead.

[¶ 30] At this point, it should be remembered that the only conflict of interest issue raised is Bierman's appearance at the preliminary hearing. The question is whether, given Smith's appointment to represent Sutton, Bierman's brief representation of Asch that day in circuit court created such a conflict that Asch's later conviction by a jury in district court should be reversed. The limited nature of this question makes it less difficult to apply an "after the fact" analysis than would be true in many cases.

[¶ 31] Bierman testified at the motion hearing that, as the supervising attorney in the Casper office, he assigned particular attorneys to particular felony cases. Misdemeanors, however, were assigned on a rotating basis by the office secretaries. Asch was charged with a felony, but Sutton was only charged with a misdemeanor. Consequently, Bierman would have assigned Asch's case to McLeod, but he would not have assigned Sutton's case to Smith. Bierman further testified that, at the time of Asch's preliminary hearing, he was not even aware that Sutton was being represented by his office. If multiple representation can be seen as an attempt to serve two masters, then there was no conflict of interest here because Bierman was not even aware that there were two masters to serve.[8]

[¶ 32] One other aspect of Bierman's testimony leads to the conclusion that no conflict of interest arose in this case. Bierman testified that, since it was his practice to advise attorneys for whom he had covered a hearing what had transpired at that hearing, he probably did so with McLeod. On the other hand, Bierman could not recall ever having discussed the case with Smith. There is nothing in the record to contradict these assertions, so the only evidence is that no information obtained by Bierman during the preliminary hearing was used to Sutton's advantage or Asch's disadvantage.

---

6. The case-by-case approach of W.R.Cr.P. 44(c) also "represents an ethical resolution" of conflict of interest issues arising under the Wyoming Rules of Professional Conduct for Attorneys at Law. Burman, *supra*, XXXV Land & Water L. Rev at 125.

7. Both Bierman and Kenneth Koski, the State Public Defender, testified at the motion hearing

as to the office's existing policies concerning conflicts of interest, which policies emphasized W.R.Cr.P. 44(c) and the rules of professional conduct.

8. It would seem that, in this situation, the only client who could have been prejudiced would have been Sutton, because Bierman was not aware he should be protecting her interests.

[¶ 33]   Looking, both figuratively and literally, at the bottom line of W.R.Cr.P. 44(c), we can only conclude that there is good cause to believe that no conflict of interest occurred in this case.   Considering the broader standard of effective assistance of counsel, we also conclude that counsel's performance in this case was not outside the wide range of professionally competent assistance, and we can find nothing in the record that substantiates any prejudice having befallen Asch by Bierman's appearance at the preliminary hearing.[9]

[¶ 34]   It should be obvious that conflict of interest issues should not come before this Court in the manner that this case came here.   Both the attorneys and the judge have a duty to recognize potential conflicts and to deal with them in open court, with the participation of the defendants, before representation has been compromised.   In the instant case, however, the single incident underlying the claim of a conflict of interest occurred before there was any reasonable opportunity for the potential conflict to be recognized.   Further, there simply is nothing in the record from which we can find that an actual conflict of interest existed.   We conclude that Asch did not receive ineffective assistance of counsel at his preliminary hearing.

***Was Asch's right to effective assistance of counsel violated as a result of counsel's failure to obtain a copy of the preliminary hearing transcript and to undertake a reasonable investigation of the case?***

[¶ 35]   Bierman testified at the motion hearing that, after he filled in for McLeod at Asch's preliminary hearing, he "probably" informed her as to what had occurred at that hearing.   McLeod agreed that Bierman "would have told her what happened."   Asch's complaint on appeal is that McLeod was ineffective in her representation of him because, having missed the preliminary hearing, she made no attempt to obtain a transcript of the proceedings, and made no determination as to whether the preliminary hearing testimony would be useful in investigating the case or for impeaching witnesses at trial.

[¶ 36]   The State called two witnesses at trial: the arresting officer, Swisher, and a crime laboratory expert.   Clearly, the State's case was based almost entirely on Swisher's testimony.   Swisher had also been the only witness at the preliminary hearing.   Asch contends that McLeod should have used portions of Swisher's preliminary hearing testimony as prior inconsistent statements to impeach his trial testimony.   As specific examples, Asch points out that (1) at the preliminary hearing, Swisher testified that the methamphetamine was not field tested, while at trial he testified that it was field tested; (2) at the preliminary hearing, Swisher testified that the methamphetamine was found on the passenger side of the "hump" between the seats, while at trial he testified that it was found tightly wedged between the two front seats; and (3) at the preliminary hearing, Swisher testified that the methamphetamine was found in an area equally accessible to the driver and the passenger, while at trial he testified that it was found in the area where he saw Asch "pushing something down."

[¶ 37]   Asch further argues that, had McLeod obtained a transcript of the preliminary hearing, she would have been able at trial to challenge Swisher's testimony by reminding him of his statements at the preliminary hearing that (1) his observations of Asch's movements were made at night, through his own windshield, through the rear window of Sutton's car, past the rear seat and into the front seat area; (2) he "really didn't have an actual view of [Asch] hiding something;" and (3) the area where the methamphetamine was found between the seats was accessible to Sutton and she could have had her hands there before the traffic stop.   Finally, Asch contends that, had McLeod

---

9.   Raising the conflict of interest issue under the banner of ineffective assistance of counsel creates an interesting dichotomy.   Under the standard test for ineffective assistance of counsel, not only is competency presumed, but prejudice must be proven.   When the issue is a conflict of interest, however, at least in the "pure" case of multiple representation by a single attorney, the conflict is presumed and no proof of prejudice is required.   The difference results, we believe, from the inherent danger of prejudice where there is a conflict of interest.

investigated what Swisher said at the preliminary hearing, she would have discovered that Sutton's car, being front-wheel drive, did not have a "hump" between the front bucket seats, as Swisher testified at both the preliminary hearing and the trial.

[¶ 38] McLeod never admitted that she had not reviewed the preliminary hearing testimony. The most she would say was that she did not recall having done so. She did, however, staunchly defend her decision not to use Swisher's testimony from that hearing to impeach him at trial:

Q [Defense Counsel] Now, is it—what generally do you use information from a preliminary hearing for? You, yourself, in a trial, what would you use it for?

A You've got to look at each individual case; is there something specific that would help you at a preliminary hearing later on. In this kind of case, there was nothing at the preliminary hearing there was going to be specifically helpful in the trial.

. . .

Q Now, at trial, and I have this if you would like to look at this also, Officer Swisher testified that he did not field test the drugs at the scene. You mentioned earlier that nothing in this case from the preliminary hearing seemed to be important at trial?

A All right. That very statement you said there, that is not a conflicting statement enough that was worth going through the rigmarole, shall we say, of trying to bring in a preliminary tape transcript.

The preliminary hearing transcript is not done by a certified court reporter. Basically inadmissible under the Supreme Court rulings right now. To bring that in, we would have to have verified the whole preliminary hearing tape before to make it accurate.

What we have is a very poor record that I think is transcribed by a secretary with headphones. In this particular case, what he said at the hearing where you're going for the not field testing or not field testing at the site, they come to the same thing.

The main point of this case and theory of Mr. Asch's defense was going to be that Sheryl Sutton owned the drugs, even—and the drugs were found in a common area; she owned them, she was the driver, thereby it was hers.

Q Okay. Now, along those lines—Let me get this straight. So you're saying you didn't feel that you wanted to put the preliminary hearing into evidence because it was poorly recorded or poorly transcribed?

A No. In the theory of this case and what our defense was going to be, it was excess baggage that only ruins your credibility with the jury.

Q And you said that his defense was that Sheryl Sutton owned the drugs?

A Owned the drugs.

Q Okay. Well, at the preliminary hearing also, Officer Swisher testified that while in his car, he didn't actually see Mr. Asch hide anything?

A Correct.

Q And at the trial you failed to question him about that. Now, if he said he didn't see him hide anything, is it possible somebody else maybe hid something?

A That is a very elementary point and I wouldn't waste the jury's time and patience with cross-examining that point.

. . .

Q Okay. Now, at the preliminary hearing, Officer Swisher also testified that the drugs were equally accessible to the driver?

A Correct.

Q And as you just said, Mr. Asch's defense was that the drugs were Sheryl Sutton's?

A Correct.

Q And you have the officer saying that the driver could have accessed the drugs, yet you didn't impeach him with that at trial either?

A There was no point to it. It wasn't that great a point, yes.

. . .

Q Well, did you ever investigate the car?

A I'm sure I did.

Q Did you become aware of what the interior of the car looked like?

A I was aware of what the interior of the car was like from one of my first conversation[s] with Mr. Asch, plus I've also been going to trial, I'm sure I met with Swisher and also there was a very most key person described the car would have been Sheryl Sutton, the owner, she was taking the stand.

Q And were you aware of not only the inside but the outside of the car as well from that?

A I'm sure I was.

Q And did you have a chance to review the preliminary hearing, besides what Mr. Bierman told you?

A I don't recall.

Q So you wouldn't recall if he told you what Officer Swisher said about the physical nature of the car?

A No.

Q So you would have no basis on which to impeach him on cross-examination if his view of the car was, in fact, inaccurate?

A The way you would impeach would be to call the owner of the car who was familiar with the car to testify to the jury what the inside of the car is like. The jury would then be able to see as the officer testified wrong and the owner, who knows the car, testified that maybe he doesn't recall other things quite as well either.

It's much more effective to have the actual proof there from the actual owner than to go through a litany of just going through words from a poor transcript, vague words.

Q Now, but you didn't feel that had there been inaccuracies it would not be important to put the owner up there, to put the owner up there to give the description of the car and impeach Officer Swisher's recollection of the car?

A Sheryl Sutton did testify.

. . .

Q Now, it also came out in the preliminary hearing of what kind of car it was, certain aspects, so you could have impeached Officer Swisher on any inaccuracies; is that true?

A I'm sure it is.

Q But you chose not to?

A No. Some things are much more effective, and that is not a very effective way of establishing points in trial.

. . .

Q And now, all these other things that we previously mentioned that happened at the preliminary hearing, you didn't feel those would impeach his credibility so you chose not to cross-examine him on that, all these—there's tangible physical inaccuracies of his—

A Not sufficient to make a point.

Q But the fact is—

A Once you get into doing trial work you will realize that you ruin your trial by going after every little possible point you can. You go with the theory of the case, figure out your main point and go with it. To go after every little nitpick you can makes you look like a fool to the jury and it makes your case a lot worse.

. . .

Q [Prosecutor] Now, the field testing. Was there actually a chemist that testified to a chemical test to the trial?

A Yes. When there's not a question raised whether the drugs are drugs, then there's no point to question whether a field test was done at the scene or at the police department.

Q I think you stated this in substance in your testimony, but in your experience, is it best to focus upon one clear and concrete theory rather than attacking everything that moves?

A Yes. About the only way to win in a good case is to have one theory and go for it; a shotgun case, you shoot yourself in the foot.

. . .

Q Given that was going to be the theory of the defense, did you think that bringing up minor points with Mr. Swisher would be effective?

A No. I did not want to create jury sympathy for the police officer.

. . .

Q Yes. In your opinion, do you believe that the tactical decision, even though it might not have been successful, was sound when you made it, that is, to rely on Sheryl Sutton's testimony in this particular case?

A The only thing that was relevant in this case is who owned those drugs. Mr. Asch with his criminal record could not take the stand. We did discuss that in full and it was his choice not to take the stand. With his record, with all his drug felonies it would not have worked.

So the only person then would have to be somebody else to say they had. We did have the law that says the driver should be presumed to be in possession of the drugs. The officer was saying it was him. The only form of testimony would have to be that somebody else owned the drugs.

Q And did you feel it was a sound tactical decision to concentrate on Sheryl's testimony rather than cross-examine the officer about minor matters in doing so?

A That was the only possibility.

[¶ 39] As stated earlier herein, our standard for review of claims of ineffective assistance of counsel requires an appellant to prove both that counsel's performance was deficient and that prejudice to the appellant resulted. The adequacy or deficiency of counsel's performance is measured under an objective test, the question being whether counsel provided such assistance as would have been provided by a reasonably competent attorney. *Becker*, 2002 WY 126, ¶ 12, 53 P.3d at 98 (*quoting Reyna*, 2001 WY 105, ¶ 19, 33 P.3d at 1134–35).

■ [¶ 40] We have long recognized that failure of counsel to conduct a reasonable investigation may constitute ineffective assistance of counsel. *Epperson v. State*, 637 P.2d 671, 672–73 (Wyo.1981). Our first detailed analysis of counsel's duty to investigate came in *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986):

The United States Supreme Court has outlined trial counsel's duty to investigate as follows:

" ' * * * [S]trategic choices made after less than complete investigation are rea-

sonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* * * * The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. * * * [W]hat investigation decisions are reasonable depends critically on such information. * * * ' (Emphasis added.) *Strickland v. Washington*, 104 S.Ct. at 2066."

The reasonableness of investigation decisions depends on other evidence as well. "[I]n those cases involving claims of inadequate investigation * * * consideration [must be given to] the strength of the evidence known to counsel that suggested further inquiry was needed." 2 LaFave & Isr[ae]l, Crim.Proc. § 11.10(d) at 25 (1986 Pocket Part).

(Emphasis in original.) We reversed Frias' second-degree murder conviction because Frias' attorney ignored considerable evidence that the victim had committed suicide and made no independent investigation into that defense. *Frias*, 722 P.2d at 147.

■ [¶ 41] Since *Frias*, we have had numerous occasions to revisit this issue. Our developing jurisprudence has reflected our application of an objective test based on the totality of the circumstances, judged from the perspective of counsel at the time. In particular, we have distinguished between reasonable decisions made as part of trial strategy, and unreasonable decisions resulting from a failure to investigate. *Lancaster v. State*, 2002 WY 45, ¶ 58, 43 P.3d 80, 102 (Wyo.2002). In that regard, an appellant cannot prove ineffective assistance of counsel for failure to investigate a possible defense unless there are facts in the record indicating the availability of that defense. *Reyna*, 2001 WY 105, ¶ 25, 33 P.3d at 1137. The same principle holds true where an appellant fails

to identify the favorable evidence or witnesses that additional investigation would have revealed. *Shipman v. State,* 2001 WY 11, ¶¶ 10–14, 17 P.3d 34, 37 (Wyo.2001); *Grainey v. State,* 997 P.2d 1035, 1040 (Wyo. 2000).

[¶ 42] A failure to investigate or to prepare adequately for trial does not constitute ineffective assistance of counsel where the failure is the appellant's fault. *Mapp v. State,* 953 P.2d 140, 144 (Wyo.1998) (*pro se* defendant asked standby counsel to take over case three days before trial). Further, ineffective assistance of counsel cannot be premised on the failure to investigate a particular defense where that defense is presented and argued to the jury. *Dean v. State,* 931 P.2d 942, 946 (Wyo.1997). On the other hand, a failure to investigate that results in counsel's failure to file a motion to suppress evidence, where the motion likely would have been successful, does constitute ineffective assistance of counsel. *In Interest of LDO,* 858 P.2d 553, 557–59 (Wyo.1993).

[¶ 43] Failure to interview an eyewitness is so egregious that it has been considered ineffective assistance of counsel without the need to show prejudice, such being presumed. *King v. State,* 810 P.2d 119, 123 (Wyo.1991); *Gist v. State,* 737 P.2d 336, 343 (Wyo.1987). "Strategic justification cannot be extended to the failure to investigate." *King,* 810 P.2d at 123. Where a proper investigation has been made, however, the decision to call or not to call a particular witness is "virtually unchallengeable" as a strategic choice left to counsel's discretion. *Laing v. State,* 746 P.2d 1247, 1249 (Wyo. 1987).

[¶ 44] Application of this law to the facts of this case leads us to the inescapable conclusion that McLeod's representation of Asch was deficient. There were three people who could testify as to who possessed the methamphetamine: Asch, Sutton, and Swisher. Asch was tactically unavailable because of his criminal record. Sutton was willing to, and did, testify that the methamphetamine belonged to her. The State's case depended entirely on Swisher's testimony about what he saw during the traffic stop. Consequently, cross-examination of Swisher was necessary not only to point out inconsistencies and weaknesses in his testimony, but also to bolster Sutton's testimony. Yet, McLeod made no effort to use Swisher's preliminary hearing testimony in cross-examination; in reality, she made no effort to cross-examine him at all as to what he saw.[10] No reasonable attorney would have allowed this case to go to the jury without having investigated Swisher's testimony and without having raised questions about his observations.

[¶ 45] The next question is whether Asch was prejudiced by counsel's deficient performance. To prove prejudice, an appellant must show " 'a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different.' " *Dickeson v. State,* 843 P.2d 606, 611–12 (Wyo.1992) (*quoting Frias,* 722 P.2d at 147). We find in that regard that counsel's failure in this case is closely akin to the failure to interview an eyewitness, in which case prejudice is presumed. Asch's only hope of winning this case was to convince the jury that, given the location of the methamphetamine in an area equally accessible to Sutton, the State could not prove beyond a reasonable doubt that Asch was in possession. The only proof that Asch, rather than Sutton, possessed the methamphetamine was what Swisher claimed to have seen through the rear window of Sutton's car. McLeod's failure to investigate and test Swisher's testimony, therefore, went to the very heart of the State's case. That is a deficiency that is "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). We conclude that Asch did not receive effective assistance of counsel.

*Was Asch's right to effective assistance of counsel violated as a result of counsel's failure to ensure that Asch would be in street clothes during the trial?*

[¶ 46] This case went to trial on February 22, 2000. Four days earlier, McLeod ob-

10. The cross-examination of Swisher takes up approximately three pages of the trial transcript.

tained by stipulation an Order Allowing Defendant to Wear Street Clothes. Asch's complaint on appeal is that this order was obtained too late for him to be able to obtain street clothes and that, as a result, he appeared before the jury in jail clothing. He raises the issue as a matter of ineffective assistance of counsel.

[¶ 47] Having decided to reverse Asch's conviction on other grounds, we will only briefly address the underlying issue of a defendant appearing before a jury in jail clothing. The State appears to concede that the matter is controlled by *Estelle v. Williams*, 425 U.S. 501, 504–13, 96 S.Ct. 1691, 1693–97, 48 L.Ed.2d 126 (1976), which holds that (1) forcing a defendant to wear prison attire during a jury trial may prejudice the defendant; but that (2) if the defendant is not compelled to wear prison garb, and he does not object, there is no constitutional violation. We have previously stated, though in *dictum*, that we "do not disagree with the principles of *Estelle* ...." *Campbell v. State*, 589 P.2d 358, 362 (Wyo.1979). We now reiterate that position and hold that, if a defendant objects, he cannot be compelled to wear jail or prison clothing in a jury trial, absent a showing by the State of a compelling need for such clothing. It seems to go without saying that there is a risk that jurors may draw an adverse inference when a defendant appears before them in prison attire.

*Was Asch's right to effective assistance of counsel violated as a result of counsel's calling a witness who refused to answer a question and was held in contempt of court?*

[¶ 48] Sutton was the only witness called at trial in Asch's defense. She testified that both the marijuana pipe and the methamphetamine seized by Swisher were hers, and that she had been the one who stuffed the methamphetamine down between the seats. On cross-examination, she refused to identify the person who had sold her the methamphetamine. Sutton was found in contempt of court and ordered to jail. The jury was then given the instruction quoted earlier herein to the effect that it could consider Sutton's refusal in evaluating her credibility.

[¶ 49] Asch argues primarily that McLeod was ineffective because she called Sutton to the stand, knowing Sutton would refuse to identify her source. Secondarily, Asch contends that McLeod should have done a better job of dealing with the problem by questioning Sutton about her reasons for non-disclosure. Asch premises his contention that McLeod knew both that the prosecutor would ask Sutton about her source and that Sutton would refuse to answer, on a meeting held in the prosecutor's office a few days before trial. No one disputes that the prosecutor, Sutton, and Smith (her attorney) were present, or that Sutton said during the meeting that she would not reveal her source. Asch argues that McLeod was also present. At the motion hearing on remand, Smith testified, however, that he did not believe McLeod was present. McLeod flatly denied being there.

[¶ 50] We are inclined not to pursue this contention beyond this point. Not only has Asch failed to provide convincing evidence that McLeod even knew Sutton would refuse to answer that particular question, but Asch has also not established that he was prejudiced by Sutton's refusal. We do not know how the jury perceived the matter, and we do not know what Sutton's answer would have been had she answered the question. And of even more consequence is the fact that Sutton basically was Asch's whole case. In the balance, Sutton's admission that the drugs were hers, and that she had hidden the methamphetamine as Swisher approached the car, was certainly more helpful to Asch's cause than her refusal to identify her source was harmful. Deciding whether or not to call Sutton as a witness is precisely the kind of discretionary decision that will not be second-guessed by this Court. Further, we cannot say that McLeod's direct or redirect examination of Sutton, whether or not McLeod knew of the intended refusal, was deficient.

*Did the district court abuse its discretion in instructing the jury that it could consider the witness's refusal to answer a question as bearing on her credibility?*

[¶ 51] The jury was present in the courtroom when Sutton refused to answer the

prosecutor's question as to who had sold her the methamphetamine. The jury was not present, however, during the contempt proceedings. When the jury was brought back into the courtroom, the district court judge instructed that "you can consider her refusal to answer that question in connection with your consideration of all other evidence and matters that may bear on her credibility and the credibility of her testimony before the Court."

[¶ 52] McLeod objected to the giving of this instruction, but did not contemporaneously state a reason for her objection. However, the argument over whether Sutton should be required to identify her source focused on the issue of whether such information was relevant. The State convinced the district court that the information was relevant both to the question of who possessed the methamphetamine at the time of the traffic stop and the question of Sutton's credibility.

[¶ 53] On appeal, Asch does not find fault with the wording of the instruction nor does he suggest that it is always improper to give such an instruction. Asch simply argues that the district court was wrong when it found the drug source information to be relevant. Further, Asch submits no authority in direct support of his contention. Instead, in his appellate brief, Asch attempts to equate this situation with the prosecutor's calling of a witness whom the prosecutor knows will not testify:

> Although Mr. Asch called Ms. Sutton as a witness, it was not until she was confronted with an irrelevant question *from the prosecutor* that Ms. Sutton refused to answer. This situation, then, is akin to cases in which the prosecutor calls a witness for the purpose of drawing an adverse inference from [that] witness's refusal to testify. This leaves the jury to infer that both the witness and the accused are guilty. *Jones v. State,* 777 P.2d 54, 58 (Wyo.1989); *Prime v. State,* 767 P.2d 149, 151 (Wyo.1989); and *Haselhuhn v. State,* 727 P.2d 280, 295 (Wyo.1986).

(Emphasis in original.)

[¶ 54] We have previously rejected this argument. *See Porth v. State,*

868 P.2d 236, 240 (Wyo.1994). Sutton was called by Asch, not by the State, so the spectre of the State calling a witness for an improper purpose simply is not present. And the State has the right to cross-examine defense witnesses about matters raised during direct examination and to test their credibility. *Haworth v. State,* 840 P.2d 912, 918 (Wyo.1992), *cert. denied,* 508 U.S. 930, 113 S.Ct. 2395, 124 L.Ed.2d 296 (1993). The scope of such cross-examination is a matter within the discretion of the trial court, which will not be disturbed on appeal absent a showing of abuse of that discretion. *Porth,* 868 P.2d at 240. In the instant case, it was not an abuse of discretion for the district court to find the drug source information relevant both to Sutton's credibility and to the specific issue of who possessed the drug at the time of the traffic stop.

### Was Asch denied his right to due process of law as a result of his legs being shackled during the jury trial?

[¶ 55] Asch was confined in the Natrona County Detention Center at the time of his jury trial. It has long been the policy of the Natrona County Sheriff that any inmate being transported to court from the detention center be restrained through the use of some combination of hand restraints, arm restraints, leg restraints, and belly chains. In his decision letter after the remand hearing, the district court judge confirmed testimony from the hearing that "for at least thirty (30) years" the following policy has been in effect in Natrona County as to restraint of defendants within the courtroom itself:

> With respect to the first of the topics mentioned above, the general policies of the Natrona County Sheriff's Office and this district court were delineated in testimony presented at the evidentiary hearing. That testimony set forth the established procedures which provide for a criminal defendant's hands to be free from restraints during all trial proceedings, for his legs to be restrained during the trial proceedings, for the criminal defendant to enter the courtroom and be seated behind counsel table before members of the jury enter the courtroom (thereby precluding

prospective jurors or jury members from seeing the leg restraints), and for the leg restraints to be removed in the event that a criminal defendant needs to cross the courtroom to take the witness stand. The policy and procedures are designed to assure that a criminal defendant is not observed to be shackled before the jury. The purposes behind the established procedures are to assure safety in the bar of the court, to maintain the custody of the criminal defendant, and to remove possibilities of his or her escape from custody. The administrator of the detention center testified that defendants would be unshackled in the courtroom only if they had obtained a court order to that effect or if the judge orally authorized removal of the leg shackles. .

[¶ 56] There is no dispute that, consistent with the above policy, Asch's hands were free while he was in the courtroom, but his legs were shackled. There is also no dispute that, despite the precautions described by the detention center administrator and the district court judge, one juror observed Asch in shackles throughout the one-day trial. No evidence was presented suggesting that any other juror saw the leg shackles or that the shackling played any role in the juror's deliberations.

[¶ 57] The shackling of a criminal defendant in the presence of a jury is universally condemned, although reversal of a conviction in such circumstance is not automatic. *See* Sheldon R. Shapiro, Annotation, *Propriety and Prejudicial Effect of Gagging, Shackling, or Otherwise Physically Restraining Accused During Course of State Criminal Trial,* 90 A.L.R.3d 17 (1979). In *State v. Finch,* 137 Wash.2d 792, 975 P.2d 967, 997–99, *cert. denied,* 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999), the Supreme Court of Washington analyzed cases from across the United States and presented the following rationale for the general rule, from which we quote approvingly at length:

It is well settled that a defendant in a criminal case is entitled to appear at trial

free from all bonds or shackles except in extraordinary circumstances....

This is to ensure that the defendant receives a fair and impartial trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 3 and article I, section 22 (amendment 10) of the Washington State Constitution....

This court has emphasized:

Section 22, art.1, of our constitution, declares that, "In criminal prosecutions the accused shall have the right to appear and defend in person." [11] The right here declared is to appear with the use of not on[ly] his mental but his physical faculties unfettered, and unless some ***impelling necessity*** demands the restraint of a prisoner to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty.

. . .

Courts have recognized that restraining a defendant during trial infringes upon this right to a fair trial for several reasons. The one most frequently cited is that it violates a defendant's presumption of innocence....

The presumption of innocence, although not articulated in the Constitution, "is a basic component of a fair trial under our system of criminal justice." *Estelle [v. Williams],* 425 U.S. [501], 503, 96 S.Ct. 1691 [48 L.Ed.2d 126 (1976) ].

. . .

Courts have recognized that the accused is thus entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man.... Courts of other jurisdictions, including our own, have long recognized the substantial danger of destruction in the minds of the jury of the presumption of innocence where the accused is required to wear

---

11. Wyo. Const. art. 1, § 10 provides: "In all criminal prosecutions the accused shall have the

right to defend in person and by counsel...."

prison garb, is handcuffed or is otherwise shackled. . . .

Shackling or handcuffing a defendant has also been discouraged because it tends to prejudice the jury against the accused. . . . Measures which single out a defendant as a particularly dangerous or guilty person threaten his or her constitutional right to a fair trial. . . . The Supreme Court has stated that use of shackles and prison clothes are *"inherently prejudicial"* because they are "unmistakable indications of the need to separate a defendant from the community at large." *Holbrook [v. Flynn],* 475 U.S. [560], 568–69, 106 S.Ct. 1340, [89 L.Ed.2d 525 (1986)] (emphasis added).

When the court allows a defendant to be brought before the jury in restraints the "jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers." *[State v.] Williams,* 18 Wash. [47], 51, 50 P. 580 [ (1897) ]. . . .

. . .

Shackling or handcuffing a defendant has also been discouraged because it restricts the defendant's ability to assist his counsel during trial, it interferes with the right to testify in one's own behalf, and it offends the dignity of the judicial process. . . .

. . .

When determining whether restraints should be used during a courtroom proceeding this court has stated:

"A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be 'potentially dangerous' is a failure to exercise discretion."

*[State v.] Hartzog,* 96 Wash.2d [383] 400, 635 P.2d 694 [ (1981) ].

(Emphasis in original.)

[¶ 58] While the shackling of criminal defendants at any time in the courtroom has been condemned on several grounds, shackling in the presence of the jury has clearly been seen as the most problematic. *People v. Hill,* 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673, 695 (1998). The concern that jurors will be influenced by observing the defendant in physical restraints is obviated, of course, if the jurors do not actually see the defendant in restraints. Consequently, it has been held that the mere fact that the defendant was somehow physically restrained during a jury trial does not demand reversal. *United States v. Ware,* 897 F.2d 1538, 1541–42 (10th Cir.), *cert. denied,* 496 U.S. 930, 110 S.Ct. 2629, 110 L.Ed.2d 649 (1990), *abrogated on other grounds by United States v. Jones,* 235 F.3d 1231, 1236–37 (10th Cir.2000); *State v. Apelt,* 176 Ariz. 349, 861 P.2d 634, 645–46 (1993), *cert. denied,* 513 U.S. 834, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994); *State v. Woolcock,* 201 Conn. 605, 518 A.2d 1377, 1382 (1986); *State v. Montana,* 489 So.2d 348, 349 (La.App.1986); *State v. Weidul,* 649 A.2d 318, 319 (Me.1994); *State v. Scott,* 323 N.W.2d 790, 792 (Minn.1982). Likewise, some courts have held that an inadvertent view by a juror of a defendant's shackles in the courtroom does not necessarily create prejudice or necessitate reversal. *Harrell v. Israel,* 672 F.2d 632, 635–37 (7th Cir.1982); *Gillie v. State,* 305 Ark. 296, 808 S.W.2d 320, 324–25 (1991).

[¶ 59] For several reasons, however, we are not convinced that a defendant's right to a fair trial is adequately protected by a rule that requires him to prove actual prejudice from in-court shackling. Our major concern, as it is the major concern of most courts, is, of course, the effect of shackling upon the jury. The problem with requiring a defendant to prove prejudice is that the jurors, themselves, may not even be aware that they have been prejudiced.

The Court of Appeals was correct to find that Justice Giannini's assessment of jurors' states of mind cannot be dispositive here. If "a procedure employed by the

State involves such a probability that prejudice will result that it is deemed inherently lacking in due process," *Estes v. Texas,* 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), little stock need be placed in jurors' claims to the contrary. See *Sheppard v. Maxwell,* 384 U.S. 333, 351–352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial. Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play," [*Estelle v.*] *Williams,* 425 U.S., at 505, 96 S.Ct. 1691.

*Holbrook v. Flynn,* 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). Because of this unacceptable risk, the issue of the necessity for shackling or other restraints must be addressed by the trial court before such prejudice may arise.

[¶ 60] Shackling's effect on the jury is not the only concern.

Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is trying to uphold.

*Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Further, shackling offends the presumption of innocence and it may interfere with the defendant's ability to participate in his own defense. *Zygadlo v. Wainwright,* 720 F.2d 1221, 1223 (11th Cir.1983), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984).

[¶ 61] Previously in this opinion, we discussed *Estelle* in the context of a defendant being forced to wear prison clothing at trial. We noted there that, if the defendant objects, and there is no showing by the State of a compelling reason, he cannot be forced to wear prison clothing during his jury trial. But failure to object in that situation negates the presence of compulsion. *Estelle,* 425 U.S. at 512–13, 96 S.Ct. 1691. Many courts find the shackling of a defendant to be similar, and find that failure to object acts as a waiver of the right not to be shackled or otherwise restrained. *See State v. Mills,* 196 Ariz. 269, 995 P.2d 705, 708 (1999); *People v. McCue,* 175 Ill.App.3d 762, 125 Ill.Dec. 243, 530 N.E.2d 271, 273 (1988); and *People v. Hyche,* 77 Ill.2d 229, 32 Ill.Dec. 893, 396 N.E.2d 6, 12 (1979). On the other hand, if a pretrial objection to shackling is lodged, it is an abuse of discretion for the trial court not to hold a hearing. *Rhoden v. Rowland,* 10 F.3d 1457, 1460 (9th Cir.1993).

[¶ 62] Once again, we are not convinced that it should be a criminal defendant's responsibility to ensure that he is provided a trial free from inherently prejudicial practices. That duty should belong to the State and to the court. Consequently, we hold that in future cases, defendants shall not be shackled or otherwise physically restrained in the courtroom during a jury trial, nor shall other exceptional security measures be utilized, unless the State has first moved that such measures be utilized, the court has heard such motion, and after allowing the defendant an opportunity to contest the motion, the court has stated on the record the compelling reasons justifying the measures. *See United States v. Theriault,* 531 F.2d 281, 285 (5th Cir.), *cert. denied,* 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976), *cert. denied,* 434 U.S. 870, 98 S.Ct. 212, 54 L.Ed.2d 148 (1977). At such hearing, the State has the burden of establishing the necessity for particular restraints and that such restraints are the least drastic effective measures available. *State v. Thompson,* 832 S.W.2d 577, 580 (Tenn.Crim.App.1991). The trial court must consider alternatives, and may not rely blindly on the judgment of correctional officers. *Finch,* 975 P.2d at 1003. In exercising its

discretion, the court should consider at least the following factors:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes, his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Finch,* 975 P.2d at 1002 (*quoting State v. Hartzog,* 96 Wash.2d 383, 400, 635 P.2d 694 (1981)).

[¶ 63] The rule just announced does not apply to the situation where one or more jurors inadvertently sees a defendant in physical restraints outside the courtroom. This Court has twice before considered that issue. In *Smith v. State,* 773 P.2d 139 (Wyo. 1989), three jurors inadvertently observed the defendant, in handcuffs, being transferred from the jail to the courtroom. The defendant moved for a mistrial, which motion was denied. We affirmed because "[t]here was nothing in the record which identifies the three jurors, nor is there any evidence presented to show that appellant was prejudiced thereby." *Id.* at 141. After characterizing the incident as "brief and incidental," we concluded that such an incident is not necessarily prejudicial, and to justify a new trial, actual prejudice must be shown. *Id.* Similarly, in *Eustice v. State,* 11 P.3d 897 (Wyo.2000), the jury briefly observed the defendant in handcuffs and shackles in the hallway as he was being returned to the courtroom following a break in the trial. Citing *Smith,* we affirmed the defendant's conviction on the ground that a jury's brief or incidental viewing of the defendant in restraints is not necessarily prejudicial, and there had been no showing of actual prejudice. *Id.* at 901. We further concluded that defense counsel was not ineffective for having failed to move for a mistrial. Such a

motion would have been futile because there was no inherent prejudice. *Id.* at 905.

[¶ 64] We continue to adhere to the holdings of *Smith* and *Eustice* because such occurrences outside the courtroom, unlike physical restraints within the courtroom, do not carry the same risk of inherent prejudice, do not constitute the same affront to the dignity of the judicial process, and do not infringe upon the defendant's right to the presumption of innocence and his right to participate fully in his own defense. In addition, the sheriff's duty to maintain custody over a prisoner during transportation to and from the courthouse creates a presumed necessity for physical restraints, and that necessity must be outweighed by specific evidence of actual prejudice. Consequently, if such an incident occurs, the defendant must bring the matter to the trial court's attention through a motion for a mistrial, a request for a cautionary instruction, or some other curative action, or the issue is waived. If an appropriate motion is made, the court shall hold a hearing, not to determine the necessity for the restraints, but to determine whether the defendant was prejudiced.

## CONCLUSION

[¶ 65] Asch was denied his right to effective assistance of counsel because his attorney failed to conduct an adequate investigation of matters surrounding his primary defense and failed adequately to pursue that defense at trial. Asch has not substantiated his other allegations of ineffective assistance of counsel. The district court did not abuse its discretion in instructing the jury that it could consider witness Sutton's refusal to answer a question in evaluating her credibility. The district court did, however, abuse its discretion in allowing Asch to be shackled in the courtroom throughout his trial without first requiring the State to justify such restraints on the record.

[¶ 66] We reverse and remand to the district court for a new trial.